1

2

3

4

5

6

7

8                        IN THE UNITED STATES DISTRICT COURT

9                        FOR THE EASTERN DISTRICT OF CALIFORNIA

10   DAVID SOTO,

11               Petitioner,                    No. CIV S-04-1432 LKK DAD P

12        vs.

13   EDWARD S. ALAMEIDA, et al.,

14               Respondents.                   FINDINGS & RECOMMENDATIONS

15   _____/

16               Petitioner is a state prisoner proceeding pro se with an application for a writ of

17   habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges a judgment of conviction

18   entered against him on July 24, 2001, in the Sacramento County Superior Court on charges of

19   first degree murder with use of a firearm.  He seeks relief on the grounds that: (1) instructing the

20   jury regarding flight with CALJIC No. 2.52 violated his right to due process; (2) his right to due

21   process was violated by the trial court's failure to redact prejudicial information from an

22   audiotape played to the jury; and (3) his conviction on the first degree murder charge was not

23   supported by sufficient evidence.  Upon careful consideration of the record and the applicable

24   law, the undersigned will recommend that petitioner's application for habeas corpus relief be

25   denied.

26   /////

1

## PROCEDURAL AND FACTUAL BACKGROUND[1]

In January 2001, defendant was charged in a single count with the July 21, 2000, murder of Timothy Rodriguez Antovich, with an allegation that defendant intentionally and personally discharged a firearm causing death within the meaning of section 12022.53, subdivisions (b) through (d).  It was alleged defendant had a prior serious felony conviction (a 1983 robbery conviction) within the meaning of section 667, subdivision (a), bringing him within the three-strikes provisions of section 667, subdivisions (b) through (i), and section 1170.12.  It was also alleged defendant had served two prior prison terms (for a 1991 conviction for possession of marijuana for sale, and a 1993 conviction for possession of a destructive device) within the meaning of section 667.5, subdivision (b).

The following evidence was adduced at the July 2001 trial:

On Friday, July 21, 2000, at about 11:55 p.m., deputy sheriffs, responding to reports of a shooting, arrived at the corner of 34th Avenue and Fruitridge Community Park in Sacramento, and found the 15-year-old victim, Timothy Rodriguez Antovich, lying face up on the grass just inside the park, with a gunshot wound to the back of his head.  The victim was conscious.  When the deputies asked if he knew who shot him, the victim said he did but would not identify the shooter, stating he would "handle it" himself.  The victim was taken to the hospital, where he later died of the gunshot wound, as determined by the pathologist.  A criminalist estimated the gun was fired from a distance between one and four feet away from the victim.  Hospital records showed the victim had a blood alcohol level of .06.  The combination of alcohol and brain injury could have caused him to be confused, though the area of the brain injured by the bullet did not control ability to recall events.

In an initial canvas of a quadplex of apartments bordering the park, the deputies were unable to locate anyone who admitted knowing anything about the shooting.  On July 23, 2000, sheriff's detectives interviewed Ginger Ball, a tenant in apartment number 3 of a building on 34th Avenue, next to the park.  She acknowledged she made the 911 call.  She told the detectives she lived with Kevin Medley and Yolanda Medley. She did not mention other residents of the apartment – defendant, defendant's friend Jeff White, aka Cowboy, and the Medley's infant. The detectives interviewed the Medleys, who also said nothing about defendant.[2]

---

[1]  The following summary is drawn from the February 3, 2003 opinion by the California Court of Appeal for the Third Appellate District (hereinafter Opinion), at pgs. 2-11, lodged in this court on December 20, 2005.

[2]  Because some witnesses share surnames, we shall refer to people by their first names.

Law enforcement officers did not learn of defendant's existence until early August 2000.  Pursuant to a tip, they asked Ginger about "David."  She supplied his surname, said he was her boyfriend and he was currently in Los Angeles and was not present at the apartment on the night of the shooting.

Ginger testified at trial, however, that defendant was at the apartment that night.  She last saw him around 9:00 p.m. (at which point he had consumed some beer but was not drunk).  Ginger was taking a shower when the shooting occurred.  After she called the police, Ginger received a telephone call from defendant, who asked her to pick him up at the bus station.  Ginger testified she did not ask, and defendant did not say, why he was at the bus station.  Jeff arrived and gave Ginger a ride to the bus station, and then dropped off Ginger and defendant at a motel.  Ginger testified it was her idea to spend the night in a motel, because of the commotion from the shooting.  She mentioned the shooting to defendant, and he said he heard something happened.  However, they did not talk about it.  Ginger and defendant were having relationship problems.  Ginger, who was unemployed and receiving public assistance, was upset about defendant's friends living with them without contributing to the rent.

The day after the shooting (Saturday), Ginger returned home, gathered defendant's eyeglasses and some of his clothes, and returned to the motel.  She and defendant spent the second night in a different motel.  It was defendant's idea to change motels, but he did not explain why.  At both motels, Ginger registered in her own name and paid cash.

On Sunday, Ginger left the motel and returned home.  Defendant never returned home after the night the victim was shot.  Defendant telephoned Ginger a few days later and said he was staying with his parents in Los Angeles so that he and Ginger "could separate for awhile."

Defendant's employer (operator of a concrete construction company) testified that before the date of the shooting, defendant was employed part-time, three days a week, earning $20 per hour.  Defendant worked Saturday (the day after the shooting) and half a day Monday before telling the employer he was leaving for personal reasons.  Defendant later called the employer and said he decided to go to Los Angeles.

A neighbor of defendant's, Frank Guadiana, lived in apartment number 1.  He initially told the deputies he knew nothing about the shooting, other than hearing the gunshots while he was watching television with his children.  Months later, in October 2000, Frank admitted to sheriff's investigators that he disposed of a gun the night of the shooting.

/////

3

At trial, Frank Guadiana testified under a grant of immunity. He testified he owned a gun which he loaned to defendant some time before the shooting. Frank was in his apartment when he heard the gunshots. Frank testified his children (15-year-old Debbie and eight-year-old Andy) were outside but came inside after the shooting. Defendant then came in and handed Frank the gun and said "Back me up." Frank threw the gun into a dumpster two blocks away, but then decided it was too close, and he had his daughter Debbie retrieve the gun from the dumpster. Frank kept the gun in his garage until two weeks later, when he threw the gun into the river.

Frank testified at trial that he disposed of the gun and lied to the deputies because he did not want to be connected to the crime as an accessory, for having provided and disposed of the gun.

At the time of trial, Frank and his family were living in Los Angeles. In the year between the shooting and trial, Frank went back and forth between Sacramento and Los Angeles, looking for work in Los Angeles. About 24 hours after the shooting, Frank went to Los Angeles for three days, then returned to his Sacramento apartment. Two months later, Frank moved to his brother's home in Los Angeles, returning to spend weekends with his family in Sacramento. Around Thanksgiving, Frank's family moved out of the 34th Avenue apartment. Frank did not file any change of address with the post office or Department of Motor Vehicles. Detectives did not check the post office, but did check the Department of Motor Vehicles and found no change of address.

Debbie Guadiana (age 16 at the time of trial) testified at trial that she was outside her apartment building, sitting on a parked car, when the shooting occurred. She saw defendant come out of the apartment and walk toward a green electrical box; she did not see the victim lying on the ground. Debbie's younger brother, Andy, was walking behind defendant. Defendant told the boy to go back in the house. Debbie heard the first shot, then turned and saw defendant pointing a gun down to the ground, then saw a flash of light from the gun as defendant fired the second shot. She did not see the target of the shots. Debbie went inside. Defendant entered and handed the gun to Debbie's father.[3] At her father's direction, Debbie retrieved a gun from a dumpster and gave it to her father. Debbie did not tell law enforcement officers until October (almost three months after the shooting) that she saw the shooting. Debbie denied that her father told her what to say. Debbie saw defendant and the victim arguing about a stereo speaker a few days before the shooting; defendant used foul language.

---

[3] The parties cite Debbie's preliminary hearing testimony that she did not see defendant hand the gun "to anyone else." The parties appear to construe this as a statement that defendant did not hand the gun "to anyone," which is inconsistent with Debbie's trial testimony.

Andy Guadiana (age nine at the time of trial) testified he saw defendant shoot the victim.  Andy was outside and had been riding Tim's bike, with Tim's permission.  Defendant came out and told Andy to go inside.  Andy started to go inside.  Andy looked in the direction of defendant and the victim, saw defendant pointing a gun down toward the victim and saw two flashes.  Andy did not hear defendant or the victim say anything.  Andy said defendant did not enter the Guadiana apartment after the shooting.  Andy initially told the detectives that he knew nothing about the shooting, because his father had told him not to tell anyone what he saw.  Andy later told the detectives what he saw, because his mother and father told him to do so.

Debbie's boyfriend, Charles Simmons, (nicknamed J.R.), testified he was living with the Guadianas and was in Debbie's bedroom weighing marijuana when he heard a gunshot, ran to the living room, heard and saw the flash of a second gunshot, and saw defendant running.  J.R. took his drugs and went to his aunt's house, because he did not want to get "busted."  J.R. spoke with sheriff's deputies a few days after the shooting, and again in September and October, but it was not until J.R. was trying to get work furlough to avoid custody on an unrelated offense that he told the officers defendant asked him for ammunition for a .32 caliber gun hours before the shooting.

Several minutes after the shots, Kevin and Yolanda Medley went outside, saw the victim, and asked who shot him.  The victim replied "Jose, Jose."  When asked where, the victim said "Next door, next door," and pointed toward the door of defendant's apartment.  Kevin knew no one named Jose, and defendant did not go by that name.  On the audiotape of Ginger's 911 call, Kevin can be heard saying "Jose shot him," and Ginger and Yolanda stated they had no idea who Jose was.  Kevin testified at trial that after the shooting, Andy said he saw David shoot the victim, and Andy's father swatted him on the head, said "'You didn't see anything,'" and told Andy to keep his mouth shut.

Jeff White (nicknamed Cowboy) testified that hours before the shooting, a gun that could have been a .32 caliber was passed around among a group of people sitting out by the green electrical box; the group included Jeff, J.R., Kevin, and the victim.  The victim was drinking heavily, got sick and passed out on the grass.  Jeff testified he heard gunshots that night but was not concerned because it was common in the neighborhood.  Several minutes later, defendant asked for a ride.  Jeff obliged and dropped defendant off downtown after defendant kept changing his mind as to where he wanted to go.  Ginger later asked Jeff for a ride to pick up defendant at the bus station.

Defendant did not testify at trial (or present any defense witnesses), but in his interview with detectives, which was played for the jury,

5

defendant denied any involvement in the shooting.  He left his apartment, unaware of any shooting, with his friend Jeff, because defendant and Ginger were arguing, and she would not leave, so he did.  They were arguing because defendant had driven Jeff's truck over a neighbor girl's dog, and the girl was trying to start trouble by throwing urine and dog toys at the door to defendant's apartment. Defendant had Jeff drop him off at the Greyhound bus station, thinking he would go to Los Angeles (without his belongings).  At some point that night, defendant telephoned home.  Ginger told him about the shooting and told him the victim had said someone named Jose shot him.  Defendant did not know anyone named Jose, and no one called defendant Jose.  Jeff and Ginger picked up defendant, and defendant and Ginger stayed the night in a motel. When asked why they stayed in a motel rather than return home, defendant said he did not want to go home "because of the commotion," and someone said defendant was the shooter. Defendant felt he was being set up as the perpetrator by Kevin, who was "pissed off" because defendant had complained about Kevin letting people (including the victim) sleep in defendant's apartment and told Kevin he could no longer stay at defendant's apartment.  When asked about an argument over stereo speakers, defendant said it was nothing; the victim had promised to sell defendant a used stereo speaker for five dollars but forgot to deliver it.  Defendant, who had not yet paid for the speaker, simply reminded him about it.  When detectives asked if defendant thought Frank was the shooter, defendant said no.  Defendant indicated it was a high crime area.

Defendant was arrested in Whittier by a police officer who knew defendant and his family.  The officer had encountered defendant on the streets on prior occasions, without defendant taking evasive action, except once when defendant had a beer in his hand.

In closing arguments to the jury, the prosecutor acknowledged some prosecution witnesses were weak and made inconsistent statements, but argued these matters were attributable to these persons' antipathy toward law enforcement and reluctance to get involved.  Defense counsel, in his argument to the jury suggested defendant was being framed in order to protect Frank Guadiana from being charged with the homicide.

On July 24, 2001, the jury returned verdicts finding defendant guilty of first degree murder, and finding true the allegation that he discharged a firearm within the meaning of section 12022.53.

A court trial was held concerning the prior conviction and prior prison term allegations, and the court found true all such allegations.  The trial court sentenced defendant to state prison for 82 years to life, as follows: (1) 25 years to life for first degree murder, doubled pursuant to section 667, subdivisions (b) through (i) to a minimum term of 50 years to life; (2) plus a consecutive

6

term of 25 years to life for the firearm enhancement under section 12022.53; (3) plus seven years for the prior convictions (consisting of five years for the prior conviction under section 667, subdivision (a), and one year for each of the two prior prison terms under section 667.5, subdivision (b)).

ANALYSIS

I.  Standards of Review Applicable to Habeas Corpus Claims

A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of some transgression of federal law binding on the state courts.  See Peltier v. Wright, 15 F.3d 860, 861 (9th Cir. 1993); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)).  A federal writ is not available for alleged error in the interpretation or application of state law.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000); Middleton, 768 F.2d at 1085.  Habeas corpus cannot be utilized to try state issues de novo.  Milton v. Wainwright, 407 U.S. 371, 377 (1972).

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Clark v. Murphy, 331 F.3d 1062, 1067 (9th Cir. 2003).  Section 2254(d) sets forth the following standards for granting habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

See also Penry v. Johnson, 532 U.S. 782, 792-93 (2001); Williams v. Taylor, 529 U.S. 362 (2000); Lockhart v. Terhune, 250 F.3d 1223, 1229 (9th Cir. 2001).

7

1     The court looks to the last reasoned state court decision as the basis for the state

2  court judgment.  Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).  Where the state

3  court reaches a decision on the merits but provides no reasoning to support its conclusion, a

4  federal habeas court independently reviews the record to determine whether habeas corpus relief

5  is available under section 2254(d).  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003);

6  Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).  When it is clear that a state court has not

7  reached the merits of a petitioner's claim, or has denied the claim on procedural grounds, the

8  AEDPA's deferential standard does not apply and a federal habeas court must review the claim

9  de novo.  Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003); Pirtle v. Morgan, 313 F.3d 1160,

10  1167 (9th Cir. 2002).

11  II.  Petitioner's Claims

12       A.  Jury Instruction Error

13       Petitioner claims that the trial court violated his right to due process by giving a

14  jury instruction on flight.  He claims that the flight instruction "created an unconstitutional

15  permissive inference of guilt despite the absence of a rational basis for doing so."  (Pet. at 6.)

16       The California Court of Appeal rejected petitioner's jury instruction error

17  argument, reasoning as follows:

18       Defendant contends the jury instruction on flight, CALJIC No.
      2.52, violated his constitutional right to due process, by permitting
19       an irrational inference of consciousness of guilt from evidence
      showing he left Sacramento shortly after the shooting.  This
20       contention is meritless.

21       The jury was instructed: "The flight of a person immediately after
      the commission of a crime, or after he is accused of a crime, is not
22       sufficient in itself to establish his guilt, but is a fact which, if
      proved, may be considered by you in the light of all other proved
23       facts in deciding whether a defendant is guilty or not guilty.  The
      weight to which this circumstance is entitled is a matter for you to
24       decide.

25       "Whether or not evidence of flight shows a consciousness of guilt,
      and the significance to be attached to such a circumstance, are
26       matters for your determination."

8

A flight instruction is proper "'whenever evidence of the circumstances of defendant's departure from the crime scene or his usual environs, . . . logically permits an inference that his movement was motivated by guilty knowledge.' [Citation.]" (People v. Lucas (1995) 12 Cal.4th 415, 470, 48 Cal.Rptr.2d 525, 907 P.2d 373.)

Defendant predicts the United States Supreme Court will one day hold that California law (§ 1127c[4]; People v. Pensinger (1991) 52 Cal.3d 1210, 1243, 278 Cal.Rptr. 640, 805 P.2d 899) violates federal constitutional due process, because California law eliminates the common law requirement that a flight instruction will not be given unless there is evidence that the defendant knew he had been accused of a crime prior to fleeing.  However, we need not engage in this debate, because here there was evidence that defendant knew he had been accused of a crime prior to fleeing.  Thus, as we have seen, defendant told the detectives that he went to a motel, rather than return home on the night of the shooting, because he heard that someone was saying he was the one who shot the victim.

Defendant additionally argues that, even if the instruction is not itself unconstitutional, its use as applied to the facts of this case created an irrational permissive inference violating his federal constitutional right to due process, since one cannot conclude with substantial assurance that the presumed fact is more likely than not to flow from the proved fact on which it is made to depend, as required by cases such as Ulster County Court v. Allen (1979) 442 U.S. 140, 99 S.Ct. 2213, 60 L.Ed.2d 777.  We disagree with defendant's conclusion.

"A permissive inference violates the Due Process Clause only if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury."  (People v. Mendoza (2000) 24 Cal.4th 130, 180, 99 Cal.Rptr.2d 485, 6 P.3d 150, citing Ulster County Court v. Allen, supra, 442 U.S. 140, 99 S.Ct. 2213, 60 L.Ed.2d 777.)

Here, the jury instruction made clear the jurors were permitted, but not required to, infer consciousness of guilt from flight.  Such an inference would not be irrational in this case.  Thus, shortly after the shooting, defendant left his home and never went back.  He stayed in motels (for which Ginger registered and paid) until he left

---

[4]  Section 1127c provides: "In any criminal trial or proceeding where evidence of flight of a defendant is relied upon as tending to show guilt, the court shall instruct the jury substantially as follows: "The flight of a person immediately after the commission of a crime, or after he is accused of a crime that has been committed, is not sufficient in itself to establish his guilt, but is a fact which, if proved, the jury may consider in deciding his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine . . . .""

9

for Los Angeles.  He did not even have his eyeglasses with him when he left his home; he had Ginger retrieve his eyeglasses and some clothes the following day.  Under the facts of this case, the jury could infer, if it so chose, that defendant's flight immediately after the crime indicated a consciousness of guilt.

Defendant argues the irrationality of the inference in this case is suggested by the comparable "flight" conduct of two other individuals, Frank Guadiana and J.R. Simmons, whom the prosecution elected not to charge with the shooting after Debbie Guadiana (Frank's daughter and J.R.'s girlfriend) came forward three months after the shooting to claim she saw defendant kill the victim, even though Frank Guadiana and J.R. Simmons had previously told the police that she was inside with them when the shots were fired.  We disagree.

Frank Guadiana and J.R. Simmons also left the scene after the shooting.  Defendant points out that all three men (defendant, Guadiana and Simmons) went to the Greyhound bus station that night.  However, none of the men left town that night.  It was not merely defendant's presence at the bus station which triggered the flight issue.  Rather, it was the fact that defendant never returned home after the shooting; he slept in motels until he left for Los Angeles.  As the prosecutor argued to the jury, "[defendant] fled the fastest, and he fled the furthest.  Nobody wanted to be involved.  But [defendant], above all the others, he left that night within minutes of the shooting, and he never came back . . . ."

J.R. and Frank, in contrast, did come back, at least for a while.  J.R. spoke with the sheriff's investigator four days after the shooting.  Frank was home the morning after the shooting and spoke with sheriff's deputies outside his apartment (though he lied to them).  Thus, although Frank subsequently left town for Los Angeles, he was at his home the morning after the shooting, unlike defendant, who never returned home after the shooting.  Moreover, it could be inferred that Frank fled because he was owner of and disposed of the gun used in the shooting and feared being charged as an accessory - an inference not at odds with the jury instruction permitting the jury to infer that defendant fled from consciousness of guilt about being the shooter.

Thus, we reject defendant's contention that there was "comparable" flight by Frank and J.R., rendering "irrational" the inference that defendant fled out of consciousness of guilt.

Defendant argues any inference of flight is dispelled by the fact that after the shooting, he went to work, where he could be easily found by anyone looking for him.  However, defendant overlooks the fact that at that point in time, the law enforcement authorities did not know of his existence.   The victim had named someone else, "Jose," as the shooter, and defendant admitted he was aware

of this fact.  The sheriff's detectives did not interview Ginger until Sunday, two days after the shooting, at which point in time she withheld the fact of defendant's existence and his residence in the apartment with her.  Although defendant claimed he did not discuss the shooting or its aftermath with Ginger and therefore knew nothing about it, the jury was not required to believe that unbelievable claim.  Although defendant believed Kevin was saying to other residents that defendant was the one who shot the victim, defendant could reasonably conclude his flight from his apartment was sufficient, and he could risk going to work for a short time.   Thus, defendant's presence at work does not defeat the inference that defendant fled his home out of consciousness of guilt.

Moreover, defendant did not stay on the job for very long.  After the Friday night shooting, he worked Saturday and half a day Monday before telling the employer he was leaving for personal reasons.  Defendant later called the employer and said he decided to go to Los Angeles.  We conclude defendant's brief appearance at his workplace did not negate flight as consciousness of guilt.

We conclude there was no instructional error.

(Opinion at 23-28.)

A challenge to jury instructions does not generally state a federal constitutional claim.  See Middleton v. Cupp, 768 F.2d at 1085 (citing Engle v. Isaac, 456 U.S. at 119); Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983).  Habeas corpus is unavailable for alleged error in the interpretation or application of state law.  Middleton, 768 F.2d at 1085; see also Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens v. Housewright, 786 F.2d 1378, 1381 (9th Cir. 1986).  However, a "claim of error based upon a right not specifically guaranteed by the Constitution may nonetheless form a ground for federal habeas corpus relief where its impact so infects the entire trial that the resulting conviction violates the defendant's right to due process."  Hines v. Enomoto, 658 F.2d 667, 672 (9th Cir. 1981) (citing Quigg v. Crist, 616 F.2d 1107 (9th Cir. 1980));  See also Prantil v. California, 843 F.2d 314, 317 (9th Cir. 1988) (To prevail on such a claim petitioner must demonstrate that an erroneous instruction "so infected the entire trial that the resulting conviction violates due process.")  The analysis for determining whether a trial is "so infected with unfairness" as to rise to the level of a due process violation is

1   similar to the analysis used in determining, under Brecht v. Abrahamson, 507 U.S. 619, 623

2   (1993), whether an error had "a substantial and injurious effect" on the outcome.  See McKinney

3   v. Rees, 993 F.2d 1378, 1385 (9th Cir. 1993).

4            In order to warrant federal habeas relief, a challenged jury instruction "cannot be

5   merely 'undesirable, erroneous, or even "universally condemned,"' but must violate some due

6   process right guaranteed by the fourteenth amendment."  Prantil, 843 F.2d at 317 (quoting Cupp

7   v. Naughten, 414 U.S. 141, 146 (1973)).  In making its determination, this court must evaluate

8   the challenged jury instructions "'in the context of the overall charge to the jury as a component

9   of the entire trial process.'"  Prantil, 843 F.2d at 817 (quoting Bashor v. Risley, 730 F.2d 1228,

10  1239 (9th Cir. 1984)).  The United States Supreme Court has cautioned that "not every

11  ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process

12  violation."  Middleton v. McNeil, 541 U.S. 433, 437 (2004).  Further, in reviewing an allegedly

13  ambiguous instruction, the court "must inquire 'whether there is a reasonable likelihood that the

14  jury has applied the challenged instruction in a way' that violates the Constitution."  Estelle, 502

15  U.S. at 72 (quoting Boyde v. California, 494 U.S. 370, 380 (1990)).  See also United States v.

16  Smith, 520 F.3d 1097, 1102 (9th Cir. 2008).

17           The prosecution in a criminal case has the burden of proving each and every

18  element of the crime charged beyond a reasonable doubt.  In re Winship, 397 U.S. 358, 364

19  (1970).  Due process is violated by jury instructions which use mandatory presumptions to

20  relieve the prosecution's burden of proof on any element of the crime charged.  Francis v.

21  Franklin, 471 U.S. 307, 314 (1985); see also Sandstrom v. Montana, 442 U.S. 510, 524 (1979).

22           In general, "[a] mandatory presumption instructs the jury that it must infer the

23  presumed fact if . . . certain predicate facts" are proved.  Francis, 471 U.S. at 314.  The Due

24  Process Clause is implicated where the presumed fact is an element of the prosecution's case,

25  because in that situation proof of predicate facts will either remove the presumed element from

26  the State's case altogether or will shift the burden of persuasion on the presumed element to the

1  defendant.  Id. at 317.  In either case, such a presumption operates to relieve the State from its

2  constitutional obligation to prove beyond a reasonable doubt every essential element of the crime

3  charged.  Id. at 313; In re Winship, 397 U.S. at 364.

4         On the other hand, a permissive presumption allows, but does not require, the trier

5  of fact to infer the elemental fact from proof of the basic fact.  County Court of Ulster Cty. v.

6  Allen, 442 U.S. 149, 157 (1979).  In order for such a presumption to pass constitutional muster, it

7  must be said with substantial assurance that "the presumed fact is more likely than not to flow

8  from the proved fact on which it is made to depend."  Leary v. United States, 395 U.S. 6, 36

9  (1968).[5]  Similarly, there must be a "rational connection between the fact proved and the ultimate

10  fact presumed" -- a connection grounded in "common experience."  Tot v. United States, 319

11  U.S. 463, 467-68 (1943).  However, notwithstanding the label ultimately placed on an

12  evidentiary presumption, the ultimate test of its constitutionality remains constant:  "[t]he device

13  must not undermine the fact finder's responsibility at trial, based on evidence adduced by the

14  State, to find the ultimate facts beyond a reasonable doubt."  Ulster Cty., 442 U.S. at 156 (citing

15  In re Winship, 397 U.S. at 364).

16         CALJIC No. 2.52 does not create a mandatory presumption.  The instruction, on

17  its face, makes clear that flight alone does not establish guilt.  See CALJIC § 2.52 ("The flight ...

18  of a person after the commission of a crime or after he/she is accused of a crime is not sufficient

19  in itself to establish his/her guilt.").  The challenged instruction does not tell the jury that it must

20  infer any fact and the instruction does not shift the burden of proof to the defense or relieve the

21  state from its burden to prove the charged crime beyond a reasonable doubt.  To the contrary,

22  petitioner's jury was instructed that:

23  /////

24

25         [5] Although Leary involved analysis of a statutory presumption, "[t]he reasoning of the
26  statutory inference cases is applicable to analysis of common-law inferences."  Barnes v. United
   States, 412 U.S. 837, 844 n.8 (1973).

1
2
3
4

> each fact which is essential to complete a set of circumstances necessary to establish the defendant's guilt must be proved beyond a reasonable doubt.  In other words, before an inference essential to establish guilt may be found to have been proved beyond a reasonable doubt, each fact or circumstance upon which such inference necessarily rests must be proved beyond a reasonable doubt.

5  (CT at 186.)

6           Nor does CALJIC No. 2.52 create an impermissible permissive presumption.

7  Contrary to petitioner's argument, it would not have been "irrational" to infer consciousness of

8  guilt from petitioner's flight after the shooting.  As explained by the state appellate court, there

9  was evidence that petitioner knew someone had accused him of shooting the victim, he left the

10  apartment complex immediately after the shooting and never came back, and he went to Los

11  Angeles abruptly and without his personal belongings.  This evidence is sufficient to support an

12  instruction on flight.

13           Moreover, California Jury Instruction No. 2.52 has been repeatedly upheld by the

14  Ninth Circuit Court of Appeals.  See Karis v. Calderon, 283 F.3d 1117, 1132 (9th Cir. 2002)

15  (jury instruction on flight did not violate defendant's right to due process even though trial court

16  refused to alert the jury to possible reasons, other than consciousness of guilt, for his flight);

17  Houston v. Roe, 177 F.3d 901, 910 (9th Cir. 1999) (clearly established federal law does not

18  prohibit giving a flight instruction when the defendant admits committing the act charged);

19  McMillan v. Gomez, 19 F.3d 465, 469 (9th Cir. 1994) (where there is sufficient circumstantial

20  evidence that the defendant is the one who fled, a flight instruction is not improper).  Further, the

21  California Supreme Court has rejected the argument that CALJIC No. 2.52 creates an improper

22  permissive inference.  People v. Mendoza, 24 Cal. 4th 130, 179-80 (2000).

23           Under the circumstances of this case, an instruction allowing the jury to consider

24  petitioner's flight along with all the other evidence in deciding whether he was guilty or not

25  guilty did not render petitioner's trial fundamentally unfair and, thus, did not violate due process.

26  Petitioner has also failed to establish that, under these facts, the giving of CALJIC No. 2.52 had a

substantial and injurious influence on the jury's verdict.  See Brecht, 507 U.S. at 638.

Accordingly, he is not entitled to relief on this claim.[6]

    B.  Erroneous Admission of Evidence

         Petitioner's next claim is that his right to due process was violated when the trial

court failed to redact prejudicial and irrelevant information from an audiotape which was played

to his jury.  The California Court of Appeal fairly described the background to this claim as

follows:

> The People sought to play for the jury an audiotape of an interview
> of defendant by sheriff's detectives on October 30, 2000.  Using a
> transcript of the audiotape, defendant objected to two portions of
> the interview and sought their redaction.
>
> 1.  Reason for Argument with Ginger
>
> Defendant sought to redact the following portion of the interview:
>
> "DET. STEVENSON: - Okay.  And there was some arguing with
> Ginger.  Do you remember what the arguing was about?
>
> "[DEFENDANT]:  Um - what did we argue about?  Tell you the
> truth, I don't.  Oh.  [sic]  Oh, I know there's some - um - problems,
> too, 'cause - um - accidentally - um - I was with Jeff at some
> apartments - um - and we got his truck going.  And I was  -and I - I
> backed his truck out, and I ran over this dog that belonged to this
> [B]lack girl.
>
> "DET. STEVENSON:  Was that the same day?
>
> "[DEFENDANT]:  That wasn't the same day.  The day before or
> whatever.
>
> "DET. STEVENSON:  Oh, okay.

---

[6]  In the traverse, petitioner makes several allegations that his trial counsel rendered
ineffective assistance in connection with the giving of CALJIC No. 2.52.  (See e.g., Traverse at
8, 15, 17-18.)  To the extent petitioner is attempting to belatedly raise new claims of ineffective
assistance of counsel in this manner, the court declines to consider them.  See Cacoperdo v.
Demosthenes, 37 F.3d 504, 507 (9th Cir. 1994) (a traverse is not the proper pleading to raise
additional grounds for relief); Williams v. Giurbino, 417 F. Supp.2d 1123, 1127 n.5 (C.D. Cal.
2005);  see also Belgarde v. State of Montana, 123 F.3d 1210, 1216 (9th Cir. 1997) (claims not
raised in the habeas petition are not cognizable).  In any event, petitioner's allegations fail to
establish that he was prejudiced by trial counsel's performance in this regard.  See Strickland v.
Washington, 466 U.S. 668, 693-94 (1984).

"[DEFENDANT]:  I think it was the day before.  I don't remember what day that was.  And - um - that girl, she had went over to our house, and she started all kind of shit when I was at work.  She pissed on the - on the- um - the floor right there by our door, and she threw all kind of piss on the door and all that kind of stuff like that.  Threw all of her dog's bones or toys right there on the - on our door and that stuff.  And - uh - Ginger had mentioned that - um - she's gonna go back over there and start some trouble or whatever, stuff like that.  And I remember all that shit.  I just, you know - ."

Defense counsel argued to the court:  "I don't believe that's relevant to any issue before the jury at this time."

The prosecutor argued defendant explained his move to Los Angeles after the shooting "as stemming from relationship problems that he had with Ginger, said that he had been arguing with Ginger."  A material part of the prosecution's case was "defendant's state of mind as to whether or not his move to Los Angeles reflected a consciousness of guilt.  It is [the prosecutor's] contention that [defendant] moved to Los Angeles in order to get away from the investigation for this crime and not for the reasons that he set forth.

"This information which [defendant provided to the detectives was] bogus.  It's not offered by [defendant] in good faith.  It's not a reason that Ginger has provided, any deterioration in their relationship, and thus contradicts her with what she says.  And so I feel it is relevant.  It is probative.  It doesn't [sic] provide evidence which can be considered on the issue of consciousness of guilt.  It meets the threshold question of relevancy.  And it is admissible as an exception to the hearsay rule because it's an admission by the party defendant."

The trial court referred to another page of the transcript of the interview (which defendant did not seek to redact) in which defendant said he went to Los Angeles after the shooting because he was mad at Ginger.  The court then said:  "This is being admitted as an example of [defendant's] explanation as to the pivotal event, if you will, or the reason for going to L.A.  And that the People's theory, that is, this particular event really is not sufficient to be this pivotal event or terminating event of the relationship, and therefore, that it is an admission because it's a false matter.

"Actually, that is false, not that the activity, the running over the cats [sic], but that the reliance upon this being the reason for going to Los Angeles is false, and that is, therefore, their argument.  In reality, it may not even be hearsay.  It may be non-hearsay.  But I do find it is relevant and that the probative value outweighs the prejudice.

16

"I will allow [the prosecution] to present that information, also."

2. <u>Cowboy (Jeff) Missing Money</u>

Defendant also objected to the following portion of the interview:

"DET. STEVENSON: - do you remember Cowboy [Jeff] missing some money when he went to take a shower?  Was there any arguing over - or disagreement over that?  Do you remember?

"[DEFENDANT]:  He - Cowboy just ask[ed] - Jeff just asked me about - um - that - um - did anybody go in the room, or whatever - in the room or something.  I go, 'Why?'  Then he said something about he was missing some money.  And - uh - I asked - uh - Kevin

"DET. STEVENSON:  Uh-huh.

"[DEFENDANT]: - and Kevin asked his friends, and they say [sic], 'No.  Nobody, you know, took it.'  You know?  So we left it like that, you know?  And - and - uh - I think Jeff says, 'Most likely, somebody took it.'  But he - he don't want to make a big thing about it.  I said, 'Hey, whatever.'

"DET. STEVENSON:  So that wasn't any big deal?

"[DEFENDANT]:  No.

"DET. STEVENSON:  Oh, okay.

"[DEFENDANT]:  'Cause we were making money.  We were making good money, you know."[7]

Defense counsel argued to the court regarding the foregoing passage:  "There was [sic] discussions of this issue in limine.  It's my belief that the jury will improperly use this as evidence why there was a disagreement between [the victim] and [defendant].  I just think they would use it for improper purposes."

The prosecutor argued "[defendant] denied to the detectives that he had any animosity toward the victim on account of a theft.  He acknowledges in the interview there was some discussion of a theft of some money belonging to Cowboy, but he denied that he held [the victim] responsible for that.  So - and there has been no testimony that - to the contrary.  So basically his statement stands uncontradicted, and I think in no way does the admission of that statement prejudice him unfairly."

---

[7] Defendant and Jeff worked at the same construction company.  Defendant's employment, which was part-time, earned him $440 dollars one week, $690 another week, and $379 another week.

The trial court inquired as to whether the statement was hearsay and, if so, what exception would make it admissible, leading to the following discussion:

"[Prosecutor]:  It would be admissible as an admission.  The hearsay rule, a statement by the defendant that is relevant to a material issue in dispute.  In this case, it goes to the issue of motive, whether he had a motive to kill [the victim].  And it also would reflect on state of mind, if the jury finds that he did kill [the victim].  So it would be relevant on fixing the degree of the crime. And the jury can believe or disbelieve what [defendant] said in that regard.

"[Defense counsel]:  Except, your Honor, there's no mention that [the victim] was involved with this argument.  The theft of the money, according to the transcript, it's a discussion between him and Kevin, and then Kevin asked his friends without specifically naming which friends.  Therefore, I don't believe it's relevant.

"[Prosecutor]:  The problem here is I have been precluded from asking questions all along the way.  I could have made a more elaborate showing in this regard, but I haven't.  The bottom line, though, is, your Honor, there is some relevance, but - and there's absolutely no prejudice, so I think a[n Evidence Code section] 352[8] analysis is called for in this particular situation.  And under a 352 analysis, there is virtually no prejudice to the defendant, and so it should be admissible.

"I think redacting the tape and the transcript at this point is going to create a gap, which is in the middle of the interview, which can raise questions in people's mind[s] because you will hear a gap. You will hear a break or snap or crackle in the tape.

"[¶] ... [¶]

"On balance, I feel that there is no harm, no prejudice to the defendant, and there is some probative value to his response in this question.

"THE COURT:  I do find that there is relevance and there is probative value, in that detectives are interviewing [defendant]. You look at what he's interviewing before that, and he's talking about - they are asking whether or not there were arguments or fights, what the arguments were about.

---

[8]  Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

1

> "The detectives, . . . are trying to discover what a motive is, and again, [defendant] answers, indicating that, in fact, no, that this couldn't be a motive and gives reasons for it, that there wasn't any argument, and there was no big deal between Kevin and his friends.

2

3

> "And further indicating the reason that this was not a big deal is that he was making good money at the time, and we do have evidence in here as to type of income that he had.

4

5

> "So it does appear to the Court that it is relevant. It outweighs any potential prejudice, that it does appear to be an admission. I will allow it."

6

7

8   (Opinion at 11-17.)

9        The California Court of Appeal rejected petitioner's argument that the trial court

10   abused its discretion by failing to redact the above-described statements from the audiotape,

11   reasoning as follows:

12        Turning to the merits, we apply the following standard:

13

> "[A]n appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence, including one that turns on the relative probativeness and prejudice of the evidence in question [citations]. Evidence is substantially more prejudicial than probative (see Evid.Code, § 352) if, broadly stated, it poses an intolerable 'risk to the fairness of the proceedings or the reliability of the outcome' [citation]." (People v. Waidla (2000) 22 Cal.4th 690, 724, 94 Cal.Rptr.2d 396, 996 P.2d 46.) Assuming the evidence was not relevant, its admission does not warrant reversal unless the error "resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13; Evid.Code, § 353, subd. (b).) The reviewing court must determine if it is reasonably probable that a result more favorable to defendant would have been reached had the evidence been excluded. (People v. Anderson (1987) 43 Cal.3d 1104, 1137, 240 Cal.Rptr. 585, 742 P.2d 1306; People v. Watson (1956) 46 Cal.2d 818, 836, 299 P.2d 243.)

14

15

16

17

18

19

20

21

22

> We shall conclude that the trial court properly admitted the first challenged segment. Assuming the trial court erred in admitting the second challenged statement, the error is harmless and there is no basis for reversal of the judgment.

23

24

> 1. Argument with Ginger

25

> We begin with the challenged segment of the audiotape in which defendant said he and Ginger argued about his running over the neighbor's dog.

26

Defendant points out that the evidence showed he and Ginger were always arguing about something; he argues the topic of this argument was irrelevant, except to inflame the jury that defendant ran over a dog.  However, the fact that defendant was portraying this argument as something so grave that it drove him from his home made the topic of the argument relevant.

The prosecution argued to the jury that defendant's explanation, about leaving the apartment because of an argument with Ginger about the dog, lacked credibility because defendant and Ginger spent that night and the next two nights together at motels, despite the supposed fight and despite the expense.  Defendant argues the prosecution's argument was not convincing, because a violent homicide had just occurred a few steps from their apartment, and it was not unreasonable for them to seek to avoid the commotion or to fear returning home.  Defendant further argues that, since defendant was working, the expense was not necessarily unreasonable, nor would it be unusual for Ginger to decide to stay with defendant in order to try to salvage the relationship.

However, the evidence was probative of guilt, as defendant changed his story during the course of the interview with the detectives.  First, he said he stayed away from his apartment to get away from Ginger, because of their argument about the dog - a story inconsistent with the fact that Ginger stayed with defendant in the motel.  When the detectives elicited that Ginger also stayed in the motel and asked why the couple did not return home, defendant then stated he did not want to go home because of the "commotion," in that "there was a shooting and that stuff, and the cops was [sic] down there, the ambulance, and all that stuff like that.  And - um - I think - uh - right away - uh - somebody - . . .  I ain't too sure, but - uh - Jeff or somebody said that - um - I did it.  Something like that."  When asked why somebody would think he committed the crime, defendant said maybe Kevin was accusing him in order to get even, because defendant had told Kevin to move out.

Thus, the evidence of an argument with Ginger about the dog was probative on the issue of defendant's credibility.  The evidence about the dog was not prejudicial.  It was one small part of a 35-page interview transcript.  Moreover, the prosecution did not try to use it to portray defendant as a dog-killer.  To the contrary, the prosecutor in closing argument suggested the story about a fight over his running over the dog was a fabrication by defendant to throw the detectives off the scent.  We disagree with defendant's position that the prosecution could not present this argument without presenting evidence proving defendant fabricated the incident.

We conclude the trial court did not abuse its discretion in overruling defendant's objection to the segment of the interview concerning the dog.

2. <u>Cowboy's Missing Money</u>

Defendant contends the portion of the interview about Cowboy (Jeff) missing money was irrelevant, because the mere facts that Jeff was missing some money and discussed its disappearance with defendant, who asked Kevin about it, and that Kevin then asked some unidentified friends, who denied taking the money, had no tendency in reason to prove any disputed material issue at trial, because there was no reference to the victim.  Defendant argues that, absent some showing that the victim and defendant clashed about the missing money, the evidence was irrelevant.

The Attorney General ineffectually responds that the first challenged segment of the interview "was relevant to determining whether or not friction between [defendant] and Kevin's friend, [the victim], could have been a motive for the murder.  It was properly admitted in order for the jury to assess [defendant's] explanation that he had asked Kevin about the missing money, that Kevin had asked his friends, that Kevin's friends had said that nobody had taken the money, that Cowboy did not want to make a big thing out of it although Cowboy believed somebody most likely took the money, and that the missing money was not any big deal because he and Cowboy 'were making good money.'"

To say, as the Attorney General does, that the challenged segment was properly admitted in order for the jury to assess the information contained in the challenged segment is nonsensical.  Moreover, relevance of the challenged segment to determine friction between defendant and the victim is weak.  Although it is reasonable to infer that the victim was one of Kevin's "friends," whom Kevin questioned about Jeff's missing money, it is a stretch to infer that the victim's denial of taking money from defendant's friend might have caused friction between defendant and the victim constituting a possible motive for defendant to shoot the victim.

We shall assume for the sake of argument that the evidence should have been excluded (and we therefore need not address defendant's other arguments on this point).

Nevertheless, assuming the evidence should have been excluded, its admission does not warrant reversal unless the error "resulted in a miscarriage of justice."  (Cal. Const. art. VI, § 13; Evid.Code, § 353, subd. (b).)  The reviewing court must determine if it is reasonably probable that a result more favorable to defendant would have been reached had the evidence been excluded.  (<u>People v.. Anderson</u>, <u>supra</u>, 43 Cal.3d at p. 1104, 240 Cal.Rptr. 585, 742 P.2d 1306; <u>People v. Watson</u>, <u>supra</u>, 46 Cal.2d at p. 836, 299 P.2d 243.)

Here, defendant's prejudice argument lumps together both segments of the interview to which he interposed objections.  He argues that, without these two segments, the prosecution's case

21

depended "almost entirely" on eyewitness testimony of two children - Debbie and Andy Guadiana - whose reliability was highly questionable in that they gave inconsistent statements and tried to protect their father (as did other witnesses, according to defendant) who owned the gun and acted suspiciously in disposing of the gun used in the shooting.  However, as we have seen, the challenged segment about defendant's girlfriend being mad at him for running over a dog, was properly admitted.  There was strong evidence of flight as reflecting consciousness of guilt in this case.  Thus, the prosecution's case did not depend almost entirely on the testimony of Debbie and Andy Guadiana.

It is not reasonably probable that defendant would have received a more favorable result had the trial court redacted the audiotape to exclude the segment about Jeff's missing money.  There was other evidence of friction between defendant and the victim, in that (1) defendant admitted he was displeased about his houseguest's friends (including the victim) staying in his home; and (2) defendant admitted he and the victim had words about a stereo speaker (though defendant disputes Debbie Guadiana's characterization of the incident as an argument).

We conclude there was no evidentiary error warranting reversal of the judgment.

(Opinion at 17-23.)

As explained above, a federal writ of habeas corpus is not available for alleged error in the interpretation or application of state law.  Middleton, 768 F.2d at 1085.  Absent some federal constitutional violation, a violation of state law does not provide a basis for habeas relief.  Estelle, 502 U.S. at 67-68.  Accordingly, a state court's evidentiary ruling, even if erroneous, is grounds for federal habeas relief only if it renders the state proceedings so fundamentally unfair as to violate due process.  Drayden v. White, 232 F.3d 704, 710 (9th Cir. 2000); Spivey v. Rocha, 194 F.3d 971, 977-78 (9th Cir. 1999); Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991).  "Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process."  Id. at 920.

For the reasons explained by the California Court of Appeal, the admission into evidence of the two disputed portions of the audiotape of petitioner's police interview did not render his trial fundamentally unfair.  Petitioner's statements that he argued with Ginger about

the neighbor's dog were relevant to impeach his credibility with respect to his stated reasons for going to Los Angeles.  Further, evidence that petitioner accidentally ran over a neighbor's dog was not so inflammatory as to render his trial fundamentally unfair.  Similarly, petitioner's statements regarding Cowboy's stolen money were innocuous and confusing and could not have had a "substantial and injurious" effect on the verdict.  Brecht, 507 U.S. at 638.  The state court's decision rejecting petitioner's due process claim is not contrary to or an unreasonable application of federal law and should not be set aside.[9]

C.  Insufficient Evidence

Petitioner claims that the evidence introduced at his trial was insufficient to prove he committed deliberate and premeditated murder.  The California Court of Appeal rejected this argument, reasoning as follows:

> "Review on appeal of the sufficiency of the evidence supporting the finding of premeditated and deliberate murder involves consideration of the evidence presented and all logical inferences from that evidence in light of the legal definition of premeditation and deliberation . . . .   Settled principles of appellate review require [the reviewing court] to review the entire record in the light most favorable to the judgment below to determine whether it discloses substantial evidence - that is, evidence which is reasonable, credible, and of solid value - from which a reasonable trier of fact could find that the defendant premeditated and deliberated beyond a reasonable doubt.  Citations.]"  (People v. Perez (1992) 2 Cal.4th 1117, 1124, 9 Cal.Rptr.2d 577, 831 P.2d 1159.)

/////

---

[9]  In the petition, petitioner alleges that he did not waive his right to remain silent "nor was he allowed the presence of an attorney during questioning."  (Pet. at 6.)  Petitioner did not raise these arguments before the California Supreme Court.  (Lodged Document D – "Petitioner's Petition for Review.")  To the extent petitioner is attempting to raise new Fifth and/or Sixth Amendment claims in the petition before this court, such claims are unexhausted.  The exhaustion of state court remedies is a prerequisite to the granting of a petition for writ of habeas corpus.  28 U.S.C. § 2254(b)(1).  In any event, petitioner's claims in this regard are cursory and unsupported and should be denied on that basis.  See 28 U.S.C. § 2254(b)(2) ("[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State"); James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994) (It is well settled that "conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief").

Pursuant to CALJIC No. 8.20, which has been approved by the California Supreme Court as a correct statement of the law (People v. Perez, supra, 2 Cal.4th at p. 1123, 9 Cal.Rptr.2d 577, 831 P.2d 1159), the jury was instructed as follows:

"The word 'deliberate' means formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action.  The word 'premeditated' means considered beforehand.

"If you find that the killing was preceded and accompanied by a clear, deliberate intent on the part of the defendant to kill, which was the result of deliberation and premeditation, so that it must have been formed upon pre-existing reflection and not under a sudden heat of passion or other condition precluding the idea of deliberation, it is murder of the first degree.

"[¶] ... [¶]

"The true test is not the duration of time, but rather the extent of the reflection.  A cold, calculated judgment and decision may be arrived at in a short period of time, but a mere unconsidered and rash impulse, even though it includes an intent to kill, is not deliberation and premeditation as will fix an unlawful killing as murder of the first degree.

"To constitute a deliberate and premeditated killing, the slayer must weigh and consider the question of killing and the reasons for and against such a choice and, having in mind the consequences, he decides to and does kill."

People v. Anderson (1968) 70 Cal.2d 15, 73 Cal.Rptr. 550, 447 P.2d 942, identified three categories of evidence pertinent to the determination of premeditation and deliberation: (1) planning activity, (2) motive, and (3) manner of killing.  (Id. at p. 27, 73 Cal.Rptr. 550, 447 P.2d 942.)  Surveying prior case law, Anderson observed the California Supreme Court "sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3)." (Ibid.)

The California Supreme Court more recently said: "The Anderson analysis was intended only as a framework to aid in appellate review; it did not propose to define the elements of first degree murder or alter the substantive law of murder in any way. [Citation.]  Nor did Anderson change the traditional standards of appellate review . . .  The Anderson guidelines are descriptive, not normative.  [Citation.]  The goal of Anderson was to aid reviewing courts in assessing whether the evidence is supportive of an inference that the killing was the result of preexisting reflection and weighing of considerations rather than mere unconsidered or

rash impulse.  [Citation.]"  (People v. Perez, supra, 2 Cal.4th at p. 1125, 9 Cal.Rptr.2d 577, 831 P.2d 1159.)

Here, there was evidence of planning activity, in that defendant (1) borrowed the gun from Frank Guadiana, (2) asked J.R. Simmons for bullets hours before the shooting, and (3) told Andy to go inside immediately before defendant walked over and shot the victim.

Defendant argues the testimony of Frank Guadiana and Simmons was unreliable and, apart from the problem of reliability of that testimony, the foregoing evidence did not show planning directed at any particular shooting, much less the shooting of the victim. Defendant argues that, even if he borrowed a gun and asked for bullets, there is no evidence that he did so because he was considering using the weapon, and the evidence was equally consistent with borrowing a gun and bullets for protective purposes or some entirely different reason.

However, defendant on appeal ignores the evidence that he told Andy to go inside immediately before he walked over and shot the victim.  Thus, there was evidence that he was considering using the weapon before he actually used it.

Regarding motive, the prosecutor acknowledged to the jury in closing argument that motive was unclear.  There was evidence of friction between defendant and the victim, in that (1) defendant was displeased about the victim staying in defendant's apartment as a friend of defendant's houseguest, Kevin Medley; (2) defendant believed someone in the apartment took money from defendant's friend, Jeff; and (3) defendant argued with the victim about a stereo speaker a couple of days before the shooting.  This provides some evidence of motive, though it is not extremely strong evidence of motive to kill.

Regarding manner of killing, Andy saw defendant walk over to where the victim was lying in the grass, point the gun down toward the victim, and fire the gun.  Debbie saw the same thing, except she did not see the victim from her position sitting on the car outside of the apartment building.  The victim was shot in the back of the head, from a distance between one and four feet, as estimated by the criminalist.  This is strong evidence of a manner of killing so particular and exacting that the defendant must have intentionally killed according to a preconceived design to take the victim's life in a particular way.  (People v. Anderson, supra, 70 Cal.2d at p. 27, 73 Cal.Rptr. 550, 447 P.2d 942.)

Defendant acknowledges a shot at close range to the back of the head shows an intent to kill, but he argues it is also consistent with a rash and impulsive firing of a gun toward the ground in the dark, while drunk, without realizing anyone was there.  However, the

1    jury rejected defendant's suggestion that intoxication negated intent
     to kill.

2
     Thus, there was extremely strong evidence of planning and manner
3    of killing to support the first degree murder conviction. Substantial
     evidence supports the verdict.

4

5    (Opinion at 28-32.)

6           The Due Process Clause of the Fourteenth Amendment "protects the accused

7    against conviction except upon proof beyond a reasonable doubt of every fact necessary to

8    constitute the crime with which he is charged." In re Winship, 397 U.S. at 364.  There is

9    sufficient evidence to support a conviction if, "after viewing the evidence in the light most

10   favorable to the prosecution, any rational trier of fact could have found the essential elements of

11   the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979).  See also

12   Prantil v. California, 843 F.2d 314, 316 (9th Cir. 1988).  "[T]he dispositive question under

13   Jackson is 'whether the record evidence could reasonably support a finding of guilt beyond a

14   reasonable doubt.'" Chein v. Shumsky, 373 F.3d 978, 982 (9th Cir. 2004) (quoting Jackson, 443

15   U.S. at 318).  "A petitioner for a federal writ of habeas corpus faces a heavy burden when

16   challenging the sufficiency of the evidence used to obtain a state conviction on federal due

17   process grounds." Juan H. v. Allen, 408 F.3d 1262, 1274, 1275 & n.13 (9th Cir. 2005).  In order

18   to grant the writ, the federal habeas court must find that the decision of the state court reflected

19   an objectively unreasonable application of Jackson and Winship to the facts of the case.  Id.

20          The court must review the entire record when the sufficiency of the evidence is

21   challenged in habeas proceedings.  Adamson v. Ricketts, 758 F.2d 441, 448 n.11 (9th Cir. 1985),

22   vacated on other grounds, 789 F.2d 722 (9th Cir. 1986) (en banc), rev'd, 483 U.S. 1 (1987).  It is

23   the province of the jury to "resolve conflicts in the testimony, to weigh the evidence, and to draw

24   reasonable inferences from basic facts to ultimate facts." Jackson, 443 U.S. at 319.  If the trier of

25   fact could draw conflicting inferences from the evidence, the court in its review will assign the

26   inference that favors conviction. McMillan v. Gomez, 19 F.3d 465, 469 (9th Cir. 1994).  The

                                                26

1  relevant inquiry is not whether the evidence excludes every hypothesis except guilt, but whether

2  the jury could reasonably arrive at its verdict.  <u>United States v. Mares</u>, 940 F.2d 455, 458 (9th

3  Cir. 1991).  Thus, "[t]he question is not whether we are personally convinced beyond a

4  reasonable doubt.  It is whether rational jurors could reach the conclusion that these jurors

5  reached."  <u>Roehler v. Borg</u>, 945 F.2d 303, 306 (9th Cir. 1991).  The federal habeas court

6  determines sufficiency of the evidence in reference to the substantive elements of the criminal

7  offense as defined by state law.  <u>Jackson</u>, 443 U.S. at 324 n.16; <u>Chein</u>, 373 F.3d at 983.

8          Viewing the evidence in the light most favorable to the verdict, and for the

9  reasons described by the California Court of Appeal, the undersigned concludes that there was

10  sufficient evidence from which a rational trier of fact could have found beyond a reasonable

11  doubt that petitioner was guilty of deliberate and premeditated murder.  As explained by the state

12  appellate court, there was evidence introduced at petitioner's trial which indicated that he

13  reflected before he killed the victim.  The fact that some of the testimony was conflicting, or that

14  some of the witnesses received a grant of immunity, is irrelevant to this inquiry.  The jury was

15  responsible for evaluating the credibility of the witnesses and was entitled to rely on evidence

16  indicating that the murder was deliberate and premeditated.  The state court opinion rejecting

17  petitioner's argument in this regard is a reasonable construction of the evidence in this case and

18  is not contrary to or an objectively unreasonable application of federal law.  <u>See</u> <u>Woodford v.</u>

19  <u>Visciotti</u>, 537 U.S. 19, 25 (2002).  <u>See also</u> 28 U.S.C. § 2254(d)(1).  Accordingly, petitioner is

20  not entitled to habeas relief on his claim that the evidence introduced at his trial was insufficient

21  to support his conviction.

22                          CONCLUSION

23          Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for

24  a writ of habeas corpus be denied.

25          These findings and recommendations are submitted to the United States District

26  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

1 days after being served with these findings and recommendations, any party may file written

2 objections with the court and serve a copy on all parties.  Such a document should be captioned

3 "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

4 shall be served and filed within ten days after service of the objections.  The parties are advised

5 that failure to file objections within the specified time may waive the right to appeal the District

6 Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

7 DATED: July 7, 2008.

8

9

10 DALE A. DROZD
UNITED STATES MAGISTRATE JUDGE

11 DAD:8
soto1432.hc

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

28